FILED
2022 Sep-12  PM 03:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

---

FROM: 31860001
TO:
SUBJECT: CR 1
DATE: 09/06/2022 12:39:16 PM

FILED

2022 SEP 12  P 12: 55

U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

UNITED STATES OF AMERICA,
    Plaintiff

v.                                            Case No. 2:14-cr-329-KOB

TERRI MCGUIRE MOLLICA,
    Defendant

---

EMERGENCY MOTION for COMPASSIONATE RELEASE or
SENTENCE REDUCTION PURSUANT TO THE FIRST STEP ACT OF 2018 and
TITLE 18 U.S.C. section 3582(c)(1)(A) and
MOTION TO APPOINT COUNSEL

---

COMES NOW, Terri McGuire Mollica, Defendant, unskilled and unschooled in the law, asking this

Honorable Court for a Compassionate Release Pursuant to the First Step Act of 2018 and Title 18 U.S.C.

section 3582(c)(1)(A)(ii)(I), which states that "Extraordinary and Compelling reasons exist under any of the

circumstances set forth if the defendant is suffering from a serious physical or medical condition that

substantially diminishes the ability of the defendant to provide self-care within the environment of a

correctional facility and from which he or she is not expected to recover." Also, Defendant is asking that

this Court appoint counsel to handle this matter for her.

In the recent Concepcion v. United States No. 20-1650 decided on 6/27/2022, the Supreme Court held

that the First Step Act allows district courts to consider intervening changes of law or fact, in exercising their

discretion to reduce a sentence. Such facts included defendant's behavior in prison, rehabilitative classes taken

in prison, disparity in sentencing or excessive sentence, mental illness, health issues that place defendant at a

greater risk for severe illness should he contact COVID-19, and harsh prison conditions due to COVID-19.

Per the statute for Title 18 U.S.C. section 3582(c)(1)(A), the Court can modify a sentence upon request

from a Defendant after exhausting Administrative Remedies. (see Attachment A)

TRULINCS  31860001 - MOLLICA, TERRI MCGUIRE - Unit: MNA-X-A

--------------------------------------------------------------------------------

Defendant is asking for a Compassionate Release based on her serious medical condition along with the conditions of her confinement in light of the COVID-19 pandemic, substantially diminished my ability to provide self-care within this prison environment.

The current worldwide COVID-19 pandemic has made it virtually impossible for Defendant to receive adequate medical care within the prison environment.  Her health has been deteriorating since 2016.

The Motion for Compassionate Release is based on the following:

--------------------------------------------------------------------------------

FROM: 31860001
TO:
SUBJECT: CR 2
DATE: 09/06/2022 01:04:52 PM


I.    Health Issues

   A.    Colorectal Cancer

        "Colorectal Caner is the second leading cause of cancer related deaths in the United States.  Early

detection is critical because full recovery is likely if precancerous polyps and early-stage cancer are detected and

removed before they produce symptoms.  Cancer discovered while it remains confined to the top layer of the colon

is 95% treatable.  At present, the two major screening test for early detection for colorectal cancer are the fecal

occult blood test ("FOBT") and flexible sigmoidoscopy."  (John Hopkins Medical Tests by S. Margolis, Medletter

Associates NY 2001, p.63)  Persons with a family history of colon cancer have an increased risk.

        "The fecal occult blood test is used to detect colon cancer.  This test is used to detect hidden

bleeding and can result in earlier treatment and prolongation of life." Also, "Laboratory blood work showing

iron-deficiency anemia is also indicative of colon cancer."  (Taber's Cyclopedia Medical Dictionary, FA Davis

Philadelphia 2001, p. 327)

        Defendant has a family history of Colon Cancer; her parent died of complications from colon

cancer, just six days after being diagnosed with it.

        In July 2020, while Defendant was being seen for a uterine fibroid tumor, the outside non-FBoP

Dr. Lorissa Autery noticed a growth in the colon area.  She recommended to the FBoP that Defendant receive

a MRI and colonoscopy to identify the mass and determine whether it was malignant.  (see Medical Records

Attachment B).  At this point, Defendant did not have a significant symptoms of Colon Cancer.  The FBoP denied

the procedures.

        However, Defendant had been diagnosed with iron-deficiency anemia in October 2016, and her

blood work continues to show this deficiency (see Medical Records and Lab Reports).

        In December 2020, after developing some of the common symptoms of colon cancer, a fecal occult

blood test was performed; the results were positive.  No follow-up procedures were performed.

        In June 2021, a second fecal occult blood test was performed; again the results came back positive.

Dr. Li, a FBoP physician located at FCI Aliceville, requested a Colonoscopy and a EGD.  These procedures were

approved, but the tests were never scheduled (See Medical Records) due to COVID-19 lockdowns.

TRULINCS  31860001 - MOLLICA, TERRI MCGUIRE - Unit: MNA-X-A

---------------------------------------------------------------------------------------------------

In October 2021, Defendant spoke to the Nurse Practitioner and Physician at FPC Marianna about her concerns related to the diagnoses and the lack of care.  In November 2021, a second Colonoscopy was approved (see Medical Records)

Prior to performing the actual colonoscopy, Defendant was required to attend a "consult" with the Gastroenterologist.  This appointment was scheduled for January 31, 2022.  Due to a COVID-19 lockdown, this appointment was cancelled and rescheduled for April 19, 2022.  Defendant went to this appointment and a colonoscopy was once again recommended to the FBoP.

The Medical Staff at FPC Marianna requested the colonoscopy on 6/09/2022 (almost 2 months after the doctor's appointment) and it was approved on 7/12/2022.  As of this date, more than 2 years after being diagnosed with a mass in her colon, Defendant is waiting for the appointment to be scheduled.

Defendant is also iron-deficiency anemic (see Medical Records), which is another marker for colon cancer.  Defendant has had colonoscopy recommended by three separate doctors since July 2020.  Since that time, her symptoms have increased to the point where she can barely eat any food.

Defendant has received grossly inadequate treatment for her conditions while serving her sentence in FBoP custody.  "As long as she stays in BoP custody, she faces a substantial likelihood of substandard medical care for her life-threatening disease.  Delays in treatment have created the risk that Defendant's cancer has spread and has compromised her prospects for survival."  United States v. Beck 1:13-cr-186-6 US Dist LEXIS 108542, 2019 WL 2716505 (MD NC 6/28/2019)

B.    Uterine Fibroid Tumor

Defendant was diagnosed with a fibroid tumor in October 2016, by a Federal Bureau of Prisons employee, Richard Griffin, M.D.  The tumor was approximately 8 cm and could have been removed laparoscopically at that time.

During the period between October 2016 and July 2020, Defendant was sent to two non-FBoP physicians (Dr. Robert Cox and Dr. Lorissa Autery), both of whom recommended surgery which was denied by the FBoP.  The tumor has grown considerably and is now more than 21 cm and weighs between 15-20 lbs. (as of 7/2020).  [see Medical records]  Because of the age and weight of the fibroid, it has caused additional health problems.  (per Medical Records provided in 2020)

i.    Hernia

In January 2020, Defendant noticed a protrusion in her lower pelvic region.  In April 2020, a protrusion in her left abdominal area became visible.  The pressure from the oversized uterus has caused a hernia.  Ultrasound results performed in 8/2022, but results not available at time of this filing.  (See Affidavit)

TRULINCS 31860001 - MOLLICA, TERRI MCGUIRE - Unit: MNA-X-A

------------------------------------------------------------------------------

ii.   Uterine/Vaginal Prolapse

In 3/2022, Defendant's vaginal area began to prolapse, due to the pressure from the oversized uterus. ( See Affidavit)

C.   Chronic Medical Issues

Defendant is a "Chronic Care Level 2" as determined by the FBoP (See Attachment).  She has been diagnosed with and is taking medical for:  Hypertension, Asthma, Hyperlipidemia, Anemia.  She also takes mental health medication daily, as discussed below.

These issues represent serious medical conditions from which she will not recover, even though they can be mitigated when properly treated by medical professionals.  They may be described as "controlled," "well-managed" or "stabilized," however, it is highly pertinent that these terms all indicate a need for active monitoring, evaluation, and treatment.  "Taken all together, the Court finds that [defendant's] chronic, serious conditions, including those that are mitigated when properly treated by medical professionals, demonstrate a substantially diminished ability to provide self-care from which he is not expected to recover."  (U.S. v. McGraw 2:02-cr-18-LJM, US Dist. LEXIS 78370 (SC Ind 2019)

D.   Mental Health Issues

When defendant entered FBoP custody, she was re-diagnosed with Depression and Anxiety (see Medical Records 10/16/2016).  While she had previously taken medication for these mental illnesses, the FBoP refused to provide the prescriptions after her arrival at Aliceville.

After the 23 and 24 hour COVID-19 lockdowns that occurred from March - August 2020, Defendant had to be prescribed Celexa and Buspirone for depression and anxiety.

Defendant's depression and anxiety have been exacerbated due to the continuous COVID-19 lockdowns as well as her fearfulness for her health, especially the very real possibility of having untreated colon cancer.  On 7/29/2022, Defendant was diagnosed with Post Traumatic Stress Disorder("PTSD"), which is not currently being treated due to the COVID-19 restrictions.

"Someone who does not have diagnosable mental illness before going to prison may very well develop one during pandemic because of profound anxiety, depression , and later PTSD caused by the trauma associated with the COVID-19 conditions in federal prison."  Elizabeth Kelley "Representing People with Mental Disabilities" 2020.

TRULINCS  31860001 - MOLLICA, TERRI MCGUIRE - Unit: MNA-X-A

---------------------------------------------------------------------------------

II.     COVID-19 Risks, Centers for Disease Control Factors and Vaccinations

In the latest Centers for Disease Control  guidelines updated 6/07/2022 (see www.CDC.gov),  persons

with the underlying health conditions are at a greater risk of serious illness or death should they contract COVID-19.

High Risk individual are those with at least one severe COVID-19 outcome, with underlying health conditions of

Asthma, Cancer, Mental Health Disorders (depression), Former or Current Smoker, and Use of Immunosuppressive
Medications.

Possible increased risk include those individuals with Substance Abuse Disorders and Hypertension.

Of those factors, Defendant has the following:  Asthma (with two inhalers daily), Hypertension,
Depression/Anxiety, Post Traumatic Stress Disorder, Former Smoker, and Immune Compromised (based on steroid
medications).

One of defendant's inhalers for Asthma, Winxela 500/50 Fluticasone Propionate & Salmeterol Inhalation

Powder, is a steroid that "weakens the immune system and increases the risk of infections."  (See packing insert

from inhaler Attachment C)

In addition, Defendant has been unable to obtain any of the COVID-19 vaccinations due to being allergic to
Polyethylene Glycol, which is documented in her FBoP medical records.

----------------------------------------------------------------------------------------------

As the Medical Department has refused to provide Defendant with a special diet, Defendant has been unable

to eat part or all of her lunch and dinner since March 2022.

During the month of August 2022, Food Service prepared 62 meals (31 days x 2).  Out of the 62 meals,

48 meals contained either meat mixed with beans (chili, tacos, etc), beans (black, pinto) and/or white rice.

(see Affidavit)  More than 75% of meals provided to Defendant contained at least one item that she cannot digest

properly due to her health issues.  Added to the 31 days of breakfast cereal, the total becomes 79 meals out of 93,

or 85%.  (see the National Menu at www.BoP.gov)


C.  Feminine Hygiene Products

Due to both vaginal and colorectal bleeding, Defendant uses feminine hygiene products daily.  Per the FBoP

Program Statement No. 003-2018 (see Attachment F) the FBoP is REQUIRED to provide all feminine hygiene products

to female inmates free of charge.

From the period of 11/23/2021 - 8/31/2022, out of 281 days, no feminine hygiene products were available

for 117 days, or 42% of the time.  For at least 30 of those days, the camp was on a COVID-19 complete lockdown;
commissary was closed and no items could be purchased.  (see Affidavit)


D.  COVID-19 Vaccination

Defendant has a documented allergy to Polyethylene Glycol (see Medical Records) which is an ingredient in

the COVID-19 vaccinations.  She has been unable to receive any of the vaccines or boosters.

As such, [she] "cannot provide self-care because [she] cannot protect herself from the spread of a

dangerous and highly contagious virus."  (United States v. Perez, 451 F. Supp. 3d 288, 2020 US Dist LEXIS 57265

WL 1546422 at *4 (SD NY 4/1/2020))

"The presence of COVID-19 ... necessitates a more expansive interpretation of what self-care means" and

thus the inability of individual at high risk of becoming severely ill from COVID-19 to practice appropriate hygiene,

wear a mask and maintain social distancing is an inability to provide self-care.  (United States v. Gorai, 2:18-cr-220

2020 US DIst LEXIS 72893, 2020 WL 1975372 at *3 (D Nev 4/24/2020))

E.  Chronic Medical Conditions

Defendant suffer from Asthma, Hypertension, and Mental Health issues.  She also has indicators of colon

cancer, a fibroid tumor, hernia, and prolapse.  A chronic condition (i.e. one from which the defendant is not

expected to recover) reasonable my be found to be "serious" and to "substantially diminish the ability of the

TRULINCS  31860001 - MOLLICA, TERRI MCGUIRE - Unit: MNA-X-A

--------------------------------------------------------------------------------

defendant to provide self-care within the environment of a correctional facility, even if that condition would not

have constituted an "extraordinary and compelling reason' absent the risk of COVID-19.   (United States v. McCall

465 F.Supp. 3d 1201, 2020 US Dist LEXIS 102095 (MD Ala 6/4/2020))

As of the date of this filing, Defendant has received no treatment for the colon cancer, uterine fibroid, hernia

or prolapse.  Since the start of the pandemic, the FBoP has not treated Defendant for any issue.  Several diagnostic

tests and procedures have been scheduled only to be cancelled due to a COVID-19 outbreak or quarantine.

"Taken all together, the Court finds that chronic, serious conditions, including those that are mitigated when

properly treated by medical professionals, demonstrate a substantially diminished ability to provide self-care from

which he is not expected to recover."  (U.S. v. McCall)

TRULINCS 31860001 - MOLLICA, TERRI MCGUIRE - Unit: MNA-X-A

-------------------------------------------------------------------------------

FROM: 31860001
TO:
SUBJECT: CR 4
DATE: 09/08/2022 08:40:45 AM

IV.   COVID-19 Lockdowns and Harsh Prison Conditions

Courts have granted motions for Compassionate Release based upon the theory that the COVID-19 pandemic has created disproportionately harsh sentences and limited the rehabilitation resources available to incarcerated people.  Reunited States v. Mcrae, 17 Cr. 643 (PAE), 2021 US District LEXIS 8777, 2021 WL 142277 at *5 (SD NY 1/15/2021) "In the Court's judgment, a day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison."

Between 3/30/2020 - 7/05/2022, Defendant has been subject to 11 separate lockdown for a total of 373 days, or 45%.  Several of these lockdowns included being Defendant being locked in a cell for 24 hours per day.

During these lockdowns, inmates do not have access to visits with their families, no law library, no programming/classes, no jobs/work, limited laundry service, limited or no commissary, limited or no phone calls, video visits or emails.  Outside communication is almost non-existent.  Recreation time is not allowed.  There is also very limited health care and absolutely no mental health services offered.

On 7/26/2022, Defendant was diagnosed by FBoP Psychologist Dr. Byrd with Post Traumatic stress disorder, in part due to the trauma of these lockdowns.

See United States v. Hatcher 18-c454-10(LPK) 2021 US Dist LEXIS 147643 WL 3473236 at *3, granting early release because "Defendant has been unable to receive mental health cared, drug abuse treatment, and other important services that the court envisioned her receiving while incarcerated."

The lockdowns were as follows:

1. 3/30 - 4/28/2020   (Aliceville) Camp Lockdown; locked inside of dormitory; no access to e-mails for law library; no visits with family; no recreation time.

2. 4/28 - 8/27/2020   (Aliceville) Moved to the FCI; locked inside of a cell 23 - 24 hours per day; only access to e-mails and telephones was during time out of cell.  No access to law library.  No physical or video visits with family.  Only showered periodically.  No recreation time.

** 3. 10/27 - 11/27/2020   (Aliceville) Camp lockdown in dormitory.  No visits, law library, or recreation time.

** 4. 12/18/2020 - 2/01/2021   (Aliceville) Camp lockdown in dormitory.  No law library, visits, or recreation time.

5. 4/20/2021 - 5/03/2021   (Aliceville) Camp lockdown in dormitory.  No phones or TV's, no e-mails or

TRULINCS 31860001 - MOLLICA, TERRI MCGUIRE - Unit: MNA-X-A

---------------------------------------------------------------------------------------------

visits; no law library or recreation time.

6.  8/27 - 9/2/2021        (Oklahoma City)  Locked in cell for 23 hours per day; only access phone, email, \
    and shower for 1 hour per day.

7.  9/02 - 10/07/2021        (Tallahassee)  Locked inside the Segregated Housing Unit ("SHU") for 24 hours
    per day.  No phone, TV's, e-mails, visits with family, law library.  Showered 3 times per week.  Dressed
    in used clothing.  No recreation time.**

8.  10/7 - 10/26/2021        (Marianna)  Segregated Quarantine, locked in dormitory.  No emails, visits,
    law library, no recreation time.

9.  12/30/21 - 1/31/2022     (Marianna) Locked in dormitory due to outbreak facilitated by the Staff at
    Marianna.  No commissary, laundry, emails, visits, recreation time.

10.  1/31 - 2/10/2022        (Marianna) National Lockdown due to murders in Texas prison.  No e-mails,
     phones, visits, TV's, laundry, recreation time.

11.  6/11 - 7/05-2022        (Marianna) Outbreak caused by Staff.  No e-mails, commissary, visits, laundry,
     recreation time.

**These lockdowns were for mass punishment and disciplinary purposes, not COVID.


Note:  On 7/29/2022, Defendant was diagnosed by FBoP Psychologist Dr. Byrd with Post Traumatic Stress Disorder.
Defendant will have to be treated for PTSD for the rest of her life.


     See United States v. Sherrod No. 19-20139, 2021 US LEXIS 147643, 2021 WL 3473236 at *3 (ED Mich 8/06/2021)
noting that "the placement of an incarcerated person in quarantine for administrative convenience is an 'extreme and disturb
measure."

TRULINCS  31860001 - MOLLICA, TERRI MCGUIRE - Unit: MNA-X-A

--------------------------------------------------------------------------------

FROM: 31860001
TO:
SUBJECT: CR 5
DATE: 09/08/2022 08:41:26 AM


V.    Education  & Rehabilitation

A. Vocational Training, Reentry Classes, Adult Continuing Education, and College Classes

Since Defendant has been in the custody of the FBoP, she has completed more than 1000 hours of Adult

Education Classes, Reentry Classes, and First Step Credit Classes, including two Vocational Training Classes

(see Attachment G Transcript, which is updated through April 2022), the majority prior to the COVID-19 pandemic.

Until March 2020, Defendant regularly taught many classes, and also tutored for GED-seeking students.

Defendant has also completed numerous Religious Service classes that are not included on the Official

Transcript, including receiving a Seminary Certificate from Samford University (Birmingham, AL) and completing

a program from the American Bible College (Joplin, MO).  She is currently enrolled in college courses from at Yachal

Seminary (Bristol, TN) and is pursuing a Degree in Religious History.

The FBoP has decreased the number of classes offered due to the COVID-19 lockdowns and restrictions.  Classes

that should take one month to complete can last 3 or 4 months due to the interruptions.


B.  First Step Act Credits

The First Step Act was signed into law in December 2018, which provides opportunities for federal inmates

to earn time credited to their sentences.  Defendant has participated in this program since December 2018 - present

and has earned 690 days of credit or 23 months of time credited to her sentence as of the date of this filing.

Pursuant to the Act, the FBoP was tasked with posting these reductions to all federal inmates sentences no

later than  1/15/2022, however, Defendant has not received those credits as of the date of this filing.  Per FBoP

staff, it is unknown when the credits will post.


VI.    Time Served

Defendant was sentenced in August 2016 to 204 months incarceration.  The statutory time for this sentence

(total sentence less 15% Good Time Credit) is 175.4 months.  Defendant has served 88 months (or 51%) of this

sentence and should be credited for 23 months of First Step Act credit (see V. above) for a total of 111 months

(or 64%).

TRULINCS  31860001 - MOLLICA, TERRI MCGUIRE - Unit: MNA-X-A

----------------------------------------------------------------------------------------------------

FROM: 31860001
TO:
SUBJECT: CR 6
DATE: 09/08/2022 08:42:18 AM

VII.    Behavior in Prison

Defendant has an exemplary record while incarcerated.  In more than 5 years in federal prison, she has

not received disciplinary infractions, programmed regularly, and always kept a job, except during the

COVID-19 lockdowns.

She also voluntarily participates in the Federal Restitution Program quarterly.

VIII.   Danger to the Community

The Federal Bureau of Prisons has determined that Defendant is not a danger to the community by:

(1) Calculating her "Custody Classification" as a "0" and "Out/Community Custody," meaning she can be
     housed at a minimum security Camp with and be allowed go out into the community without officer
     supervision (see Attachment H);

(2) the Bop calculation her PATTERN score for recidivism is (-17) (see Attachment I); and

(3) allowing her to take at least three unsupervised Furloughs into the community during the previous
     nine months.

Ix.   Recidivism

As stated in section VII, Defendant's calculated PATTERN score (i.e.. her risk of recidivism) is minimums

and is calculated at a (-17).

Defendant is 56 years old; statistically the risk of recidivism is low.  The Sentencing Commission's own

data reflect that "recidivism rates decline relative consistently as age increases" with the lowest rated for offenders

aged 50 and older, per the USSC Measuring Recidivism:  The Criminal History computation of the Federal Sentencing
Guidelines at 12.  (www.ussc.gov)

TRULINCS  31860001 - MOLLICA, TERRI MCGUIRE - Unit: MNA-X-A

--------------------------------------------------------------------------------

FROM: 31860001
TO:
SUBJECT: CR 7
DATE: 09/08/2022 08:45:34 AM


X.   Disparity in Sentencing

        Defendant was a first time, nonviolent white-collar offender who signed a plea agreement.  The dollar amount
attributed to Defendant was approximately $1.5 million.  She was sentenced to 204 months incarceration and another 60
months of supervised release.  This was an unusually harsh sentence, especially in light of her former employer's sentence
of 216 months when he went to trial, was found guilty of more than 100 charges with a dollar amount of more than $13
million.  (see U.S. v. Dunning 2:14-cr-382-BJR (ND Ala 4/5/2017))

        Defendant was sentenced disproportionately higher than other similarly situated offenders, as follows:

        A.    From the 11th Circuit:
             Wire Fraud Affecting a Financial Institution

        U.S. v. Mendez Case No. 14-20160-cr-Gayles/Storres.
        At trial, Mendez was found guilty of 14 counts, total $35,252,331 fraud with $21,240,000 restitution.  He was sentence
135 months incarceration and 5 years supervised release.

        U.S. v. Oliver  Case No. 14-14585 (1:19-cv-22636-KMM)
        At trail, was found guilty of a $50,000,000 - $100,000,000 fraud.  He was sentenced to 240 months of incarceration an
years supervised release.

        U.S. v. Rabuffo  Case No.  (1:19-cv-21866-KMM)
        At trail, was found guilty of a $50,000,000 - $100,000,0000 fraud.  He was sentenced to 240 months of incarceration
5 years supervised release.

        U.S. v. Rojas  Case No. 15-20973-cr-Williams
        At trial, was found guilty of a $22 million fraud.  She was sentenced to 108 months incarceration and 5 years supervi
release.

        U.S. v. Miller  Case No. 16-20757-cr-Martinez
        At trial, found guilty of a $67 million fraud.  She was sentenced to 180 months incarceration and 5 years supervised
relapse.

        U.S. v. Kachkar  Case No. 14-60256-cr-COHN
        At trail, was found guilty of $123 million fraud.  Received 360 months of incarceration and 5 years supervised release

        U.S. v. Gutierrez  Case. No. 10-41241
        Signed a plea agreement for $10,096,812 fraud.  Received 78 month sentence and 3 years of supervised release.

        U.S. v. Roman  Case No. 1:12-cr-1
        Signed a plea agreement for $1,500,000 - $3,500,000 fraud.  Received 49 months incarceration and 3 years supervi
release.

Wire Fraud:

        U.S. v. Morgan  Case No.8:09-cr-585
        Signed a plea agreement for $14,000,000 fraud.  Received 120 months incarceration and 3 years supervised release

Mail Fraud:

        US. Perdigao Case No. Crim Act 07-103 Section L
        Plea Agreement for $23,517,538.  Received 188 months incarceration and 3 years supervised release

TRULINCS  31860001 - MOLLICA, TERRI MCGUIRE - Unit: MNA-X-A

--------------------------------------------------------------------------------

U.S. v. Vidal  Case No. 15-20008-cr
Signed a plea agreement for $35 million (restitution $18,213,000).  Received 64 months incarceration and 3 years supervised rerelease.

B.    Third Circuit:

Wire Fraud Affecting a Financial Institution

U.S. v. Ezeilo  Case No. 13-cr-634 (D NJ 9/13/2013)
Plea agreement for $2.5 million.  Received 6 months incarceration and 6 months home confinement.

C.    Sixth Circuit

Wire Fraud Affecting a Financial Institution:

U.S. v. Gahan Case No. 1:15-cr-28 (W Mid)
Plea agreement for $8 million.   Received 70 months incarceration and 5 years supervised release.

D.    Ninth Circuit

Wire Fraud Affecting a Financial Institution

U.S. v. Weaver Case No. 2:15i-cr-00087-MCF
Plea agreement for $15,387,945.  Received 50 months incarceration and 2 years supervised release.

U.S. v. Jeffreys  Case No. 2:13-cr-12-RMP
Plea agreement for $9.3 million.  Received 96 months and 3 years supervised release.

TRULINCS  31860001 - MOLLICA, TERRI MCGUIRE - Unit: MNA-X-A

---------------------------------------------------------------------------------------------------------------------------

FROM: 31860001
TO:
SUBJECT: CR 8
DATE: 09/08/2022 09:11:37 AM


XI.  Sentencing Errors

Defendant also asks this Court for a Reduction in Sentence based on Sentencing Errors.  The Fifth

Amendment provides the Defendant to the right to be tried solely on the Grand Jury's allegations.

A.    Wire and Mail Fraud Affecting a Financial Institution Title 18 U.S.C. section 1343 and 1341

Defendant's indictment from 10/31/2014, charged her with defrauding the U.S. Department of Human

Health Services ("HHS"), Health Resources Services Administration ("HRSA"), Birmingham Health Care ("BHC"),

and Central Alabama Comprehensive Health ("CACH").  None of these organizations are licensed "Financial

Institutions" per the statutory definition set for the Title 18 U.S.C. section 20.

Defendant was indicted for Wire Fraud  under section 1343 (charges 1 - 21) and Mail Fraud, section 1341

(charges 22-55).  The indictment alleged the elements for wire fraud and mail fraud.

However, per the Sentencing Transcripts (dated 8/09/2016) and the Judgment and Commitment, Defendant

was convicted of and is serving a prison sentence for Wire Fraud Affecting a Financial Institution and Mail Fraud

Affecting a Financial Institution.  The district court sentenced Defendant for crimes for which she was never

charged (see United States v. Stirone, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960)).

General Wire and Mail fraud each have three essential elements, while Wire and Mail Fraud Affecting a

Financial Institution consists of the same three elements plus an additional element that the fraud scheme affects

a Federal Deposit Insurance Corporation ("FDIC") insured financial institution, as defined under section 20.

In prosecution involving financial institutions, "proof of status that the institution is insured by the FDIC is

not a mere formality; it is an ESSENTIAL ELEMENT of the offense charged, federal JURISDICTION depends on status,

and the government must prove beyond reasonable doubt that the institution was insured when charged criminal

acts occurred."  (United States v. Platenbury 657 F.2d 797 (5th Cir. 1981))

Title 18 U.S.C. sections 1343 and 1341 provides an enhanced punishment for wire and mail fraud affecting

a financial institution, which includes the "aggravating circumstance of a fraud scheme targeted at a financial

institution, that here are two separate and distinct offenses." Jones v. United States, 526 U.S. 227, 251,

119 S.Ct 12,15, 143 L.Ed 2d 311 (1999).

The courts have held that "when a statue defines two version of an offense, one of which includes an

TRULINCS  31860001 - MOLLICA, TERRI MCGUIRE - Unit: MNA-X-A

--------------------------------------------------------------------------------

additional aggravating element that increased the maximum statutory penalty, the aggravated offense

constitutes an offense distinct form the non-aggravated offense."  United States v. Fabian, 709 F. Supp.

2d 647, 674 (4th Circuit 2011).  "This distinction applies to whether the aggravated offense was charged in

an indictment, because every element of an offense, must be charged in the indictment, submitted to a jury,

and proven by the Government beyond a reasonable doubt."  Jones @311.

"A constructive amendment to the indictment occurs when the government or court broaden the possible

bases for conviction beyond those presented to the grand jury." (United States v. Cannady 924 F3d 94, 99

(4th Circuit 2019))      "Substantive amendments to the indictment must be submitted to the grand jury."

(United States. v. Huft 512 F.2d 222, 224 (5th Circuit 1995))

"A wire fraud under title 18, U.S.C. 1343 'affects' a financial institution only if the institution itself is

victimized by the fraud, as opposed the scheme's mere utilization of the financial institution for the transfer

of funds.  United States v. Bouyea, 152 F.3d 192 (2nd Cir 1998); United States v. Pelullo, 964 F.2d 193, 215

(3rd Cir 1992); United States v. Briggs, 939 F.2d 222, 224 (5th Cir 1991); U.S. v Ubakanma, 215 F.3d 421

(4th Cir. 2000).

B. Money Laundering

In addition, Defendant was convicted of Money Laundering under Title 18 U.S.C. sections 1956 (charges

56-68) and 1957 (charges 69-74).  In both charges, the "underlying criminal activity" was specified as the Wire

and Mail Fraud Affecting a Financial Institution.

Defendant was sentenced to 180 months incarceration and 60 months supervised release for these charges.

C. Defendant's Substantial Rights

Convicting Defendant of the aggravated offense of Wire and Mail Fraud Affecting a Financial Institution

affected her substantial rights due to the facts that:

(1) The Statute of Limitations is 10 years vs. 5 years for the general fraud.  The largest element of the

fraud was the sale of a $7 million building that occurred in 2008, more than a year prior to the statute of

limitations under the general fraud, thus, increasing the sentencing range for the crime;

(2) Defendant was sentenced to 5 years of supervised release, rather than the 3 years maximum under

the general fraud;

(3) Defendant was not given actual notice of the true charges against her when the indictment stated

that the  victims HHS, HRSA, etc. when if fact the victims are supposed to be (by statute) a federally insured

TRULINCS 31860001 - MOLLICA, TERRI MCGUIRE - Unit: MNA-X-A

-------------------------------------------------------------------------------------

financial institution and was not able to adequately defend herself;

(4) Defendant would not have signed a plea agreement had she received actual notice of these charges, either through the indictment or in the Change of Plea hearing.

D.   Mail Fraud Sentencing

Defendant was convicted of general Mail Fraud under section 1341 (charges 78-82). Per the Presentence Investigation Report, the total points calculated for this crime was 21 points, with a sentencing range of 34-46 months. At sentencing, the district court sentenced Defendant to 180 months incarceration, an upward variance of approximately 135 months or 300%.

The court gave no explanation for the unreasonable upward variance, making this sentence procedurally unreasonable.

TRULINCS  31860001 - MOLLICA, TERRI MCGUIRE - Unit: MNA-X-A

------------------------------------------------------------------------------------------------

FROM: 31860001
TO:
SUBJECT: CR 9
DATE: 09/08/2022 09:30:39 AM

XII.    Summary

Defendant has served more than seven years in prison while seriously ill and in physical discomfort.  This

means that her sentence has been significantly more laborious than that served by most inmates.  (see U.S. v.

Williams, U.S. Dist. LEXIS 63824 (ND Fla 2020)).  In these seven years, the FBoP has diagnosed some of her

issues, such as the fibroid tumor, and delayed diagnosis of some, especially the potential colon cancer, but at no

time has the FBoP offered any meaningful treatment to Defendant.  This deliberate indifference to her medical

needs has caused additional health problems of colon cancer, hernia, prolapse, and PTSD.  I comparing  Defendant's

medical records from 2020 to 2022. it is obvious even to a lay person that she suffers from seriously deteriorating

health.

Defendant meets the "Extraordinary and Compelling Reasons" for release in that she suffers from a serious

physical medical condition (and has been for more than 7 years) that substantially diminished the ability of the

defendant for provide self-care within the environment of a corrections facility, and from which he or she is not

expected to recover.  Defendant will not recover from the fibroid, hernia, prolapse, or colon cancer without medical
intervention.  Since the FBoP has refused for more than 7 years to provide treatment for the fibroid, and more than

2 years to diagnose colon cancer, it is highly unlikely that she will recover from these issues if left in FBoP custody.

"In particular, neither the history and characteristic of the Defendant, nor the considerations regarding the

need for the sentence imposed warrant keeping Defendant in federal custody while he stuffers from diabetes,

hypertension, asthmatic symptoms..." (U.S. v. Torres, 19-cr-30242-Bloom, US Dist. LEXIS 123122 (SD Fla 2020)

"Requiring Defendant to continue to serve his sentence in federal custody while seriously ill with the risk of
inadequate medical care [would be] significantly more laborious than that served by most inmates.  (U.S. v. McGraw)

It also means that "further incarceration in her condition would be greater than necessary to serve the purposes of

punishment set forth in 3553(a)(2)."  (U.S. v. Beck, 425 F Supp 3d 573, 586 (MD NC 2019)).

"Releasing Defendant allows him to ... seek medical care by providers who are familiar with his medical

issues and are equipped to treat him"  and "the fact that Defendant has served less than 5 months of his sentence

is not dispositive given Defendant's current health issues and the obstacles he faces in receiving adequate and

complete medical care while incarcerated."  (U.S. v. Torres)

Defendant has been in custody for more than 7 years and that is significant punishment for someone

TRULINCS  31860001 - MOLLICA, TERRI MCGUIRE - Unit: MNA-X-A

--------------------------------------------------------------------------------

who had never been incarcerated before.  (see U.S. v. Lenah, 8:07-cr-346, US Dist LEXIS 9226 (Neb 2009).

XIII.    Conclusion

.            Defendant asks this Honorable Court to GRANT her motion for Compassionate Release with immediate

release, with or without conditions, and allow her to return home and receive proper life-saving medical treatment.

            In the alternative, Defendant asks this Court to reduce her sentence based on this sentencing errors

discussed in Section XI, as follows:

        A.  Wire and Mail Fraud Affecting a Financial Institution (charges 1 - 55):

            An essential element of fraud affecting a financial institution and a requirement for established

federal JURISDICTION is that the victim bank if FDIC insured.  The government must prove that the victim bank

was insured by the FDIC at the time of the alleged fraud.

            As HHS, HRSA, BHC and CACH are NOT FDIC financial institutions and have never been, the

government NEVER had jurisdiction to charge Defendant with these crimes.  As such, the Court did not have the

authority to sentence Defendant for these crimes.

            Therefore, Defendant asks that this court reduce the sentences for charges 1 - 55 to "0".

        B.   Money Laundering (charges 56 - 74)

            These charges required predicate charges of fraud for "illegal activity."  The charges used as

predicates were charges 1 - 55.

            These sentences should also be reduced to "0".

        C.   Mail Fraud (charges 78 - 82)

            Since the sentencing guidelines were on 37 - 46 months and the court varied 300% upward,

without explanation, Defendant requests that she be re-sentenced on these charges, per the guidelines.

            Also, Defendant asks this Honorable Court to APPOINT Counsel to handle this legal matter.

            Respectfully submitted, this the 8th day of September 2020.

TRULINCS  31860001 - MOLLICA, TERRI MCGUIRE - Unit: MNA-X-A

--------------------------------------------------------------------------------

Terri McGuire-Mollica
Reg No. 31860-001
c/o FPC Marianna
P.O. Box 7006
Marianna, FL  32446

TRULINCS 31860001 - MOLLICA, TERRI MCGUIRE - Unit: MNA-X-A

----------------------------------------------------------------------------------------

FROM: 31860001
TO:
SUBJECT: Affidavit
DATE: 09/08/2022 09:34:26 AM


County of        JACKSON

State of        FLORIDA


AFFIDAVIT


I, TERRI MCGUIRE-MOLLICA, certify under penalty of perjury, that the following is true to the best of her knowledge and recollection.

In support of this Affidavit, she avers the following:

A.    On 7/19/2022, Terri McGuire-Mollica, has a health care consolation with Nurse Practitioner Caldwell at the Feder Prison Camp in Marianna, FL, at approximately 10 am. During that meeting, Mollica's health issues of possible Colon Cance and uterine tumor causing a hernia and vaginal/uterine prolapse. NP confirmed that Mollica is on the wafting list for a coloscopy, ordered ultrasounds for the hermia and uterus, and said that she would attempt an outside gynecologist visit approval.

Also discussed was Mollica's Sulfa allergy. She has an anaphylactic allergy to the element Sulfa; she also has a allergy to ANY product that contains sulfate, including medications, foods, and hygiene products.

Mollica specifically told NP Caldwell that Food Services was serving cereal for breakfast EVERY day that contain sulfates and the she was unable to eat it. There is no alternative offered.

Also, they discussed the Laundry Department's use of sulfate-based detergent (the Sunset System) which has caused a rash all over most of her body.

Mollica asked if the NP could prescribe a special diet (which is done regularly for medical and religious reasons) and also ask the Laundry Department to wash her clothing with non-sulfate products.

Nurse Practitioner Caldwell replied that Mollica "should not eat the breakfast" and that "there was nothing she co do about a special diet or the laundry" and she should "buy hydrocortisone from the commissary."


B.    During the month of August 1 - 31, 2022, Mollica kept a food journal to determine how often she was being serve foods that she cannot eat, based on her medical issues. She only kept up with meals served with meat mixed with beans (cl tacos), beans (pinto, black), and/or rice. During the 62 meals (31 x 2) 48 or 75% of them contained at least one item she cannot eat. Added to the cereal every day, that number becomes 79 meals out of 93, or 85%.


C.    During the period of 11/23/2021 - 8/31/2022, Mollica kept a journal of how many days the FPC in Marianna failed provide feminine hygiene products. Out of 281 days, inmates were without feminine hygiene pads for 117 days or 42%.


I verify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correc pursuant to Title 28 United States Code section 1746.

TRULINCS 31860001 - MOLLICA, TERRI MCGUIRE - Unit: MNA-X-A

----------------------------------------------------------------------------------------------------

Executed on:                                          By:


    9/08/2022                                         _Terri McGuire-Mollica_

Date                                                  Terri McGuire-Mollica